Reed, J.,
after stating the facts, delivered the opinion of the court.
Comment upon the character and facts of the case is unnecessary. If a judge had the ability to do justice to it by the use of our language, it would only be misdirected energy. A more marked case of bungling, stupid conspiracy to rob a drunken, ignorant woman, and divide the proceeds, cannot be found in court records. The case of the individual who was traveling from Jerusalem to Jericho, “ and fell among thieves, who robbed him, stripped him of his raiment, and departed, leaving him half dead,” was mild in comparison. That was not done by members of the legal profession, nor by pretended friends. That transaction appears to have been open and manly, in the ordinary course of business, where hypocrisy, whisky and female influence were not involved. I trust I may be pardoned for discussing that case instead of the one under review, as it is a more pleasant ease. The inequitable distribution of Mrs. Dunn’s property is apparent. Each of the parties, except the owner, had a part of it; she alone was left out. It is not shown that she was stripped of her raiment, but her wardrobe may not have been desirable. There is no attempt on the part of the original conspirators at justification, no attempted assertion of legal title to the premises, nor any pretense that a consideration was paid. The pretended contract executed by Brown and Dunn, after Dunn had got sober and realized her situation, is, if possible, more iniquitous than the original transaction, made to pacify her, and prevent exposure until the scheme could be carried out. William G. Reddin, grantee, as pretended, of John H. Reddin, one of the originals, is the only one who saw fit to defend, and is the only appellant. The validity of his title to the land is attempted to be predicated upon the supposed fact that he was an innocent purchaser for value, without notice, and that, as such, he could take, regardless of the *523 fraud by which his grantor acquired his pretended title. In order to determine this question the court is confronted with a printed abstract of 156 pages, 24 assignments of error, and a brief and argument of appellant’s counsel of 62 pages. No briefs or arguments are filed upon the part of appellee. The industry, research, and ability of counsel for appellant in presenting the case are eminently praiseworthy, though perhaps misdirected.
Passing briefly over the earlier contentions of counsel in the argument, we find some 15 pages upon the proposition that there was no sufficient evidence of fraud. Numerous authorities are cited upon the proposition “ that fraud cannot be presumed, but must be proved like any other fact.” There is no question of the legal correctness of the proposition. In view of the facts, conceded and testified to by the conspirators themselves, the attempted subdivision and distribution of the estate by deed, followed by the immediate absconding of one of the principal actors, an attempt to justify the transaction, and establish the honesty and bona fides of it, seems rather an undervaluation of the intelligence of the court to which the argument is presented.
The next proposition sustained by an elaborate brief is to the effect that there was not sufficient evidence to impeach the acknowledgment. This is also misdirected legal energy. That there was no conveyance, no acknowledgment, or any other element of legal conveyance is not only apparent from the undisputed evidence in regard to the circumstances, but is legally and tacitly conceded by the making and execution of the contract of the 8th, in- which Dunn, by her supposed friend and legal adviser,' Pendleton, is imposed upon again, and made to believe that the former conveyance is abrogated, and she reinstated in her ownership, with Brown as her agent to sell. The making of the contract alone, regardless of other evidence, is sufficient, — a confession of the fraud that had been perpetrated.
The next proposition is that the court erred in decreeing the deed by Dunn to Brown, and from Brown to John H. *524 Reddin, and from him to appellant, to he canceled, for the reason that Dunn could not rescind, as she had not placed the parties in statu quo. I hardly think I should have the patience, or make any attempt, to examine the contention, if counsel had not made it, evidently in good faith, supported it by supposed authorities, and regarded it as tenable. It is not contended that Dunn received anything whatever from any of the parties. It is contended that John H. Reddin had a claim of $1,000 against the divorced husband of Dunn, for legal services, which he hoped to enforce against the property of Mrs. Dunn, and with that intention had an attachment levied upon her property, which proceedings were pending and undetermined at the time of these transactions, and that, after the conveyance by Brown of Mrs. Dunn’s property to him, he dismissed his attachment, and lost his lien; hence Mrs. Dunn could not rescind without placing him in statu quo as to that, as the dismissal of the attachment was voluntary, for the supposed benefit to himself and his worthy partners, — a matter in which she in no way participated, or was shown to have had any knowledge. Counsel fail to inform us what Dunn should have done, or was either legally or morally required to do, in the premises. There was no privity between Reddin and Dunn except through Brown. The consideration from Reddin, if any, went to Brown, his grantor, not to Mrs. Dunn. It is also contended that John H. Reddin paid Brown in cash $1,250, with which he absconded, and that Mrs. Dunn could not rescind without returning that money to Reddin. The absurdity of the claim as a legal proposition is so apparent, upon a bare statement of the premises, that the only wonder is that counsel should seriously attempt to maintain it.
This brings us to the consideration of the only important question in the case, which may be very briefly disposed of, viz., whether the Reddins were innocent purchasers for value. John H. was familiar with the property; had been mixed up in the affairs of the Dunns, husband and wife ; and, at the time of the transactions in question, had an attachment *525 upon the land for a demand against the husband. Pendleton appears to have been the active, moving agent throughout the whole affair, and for such' participation his wife, at his instance, received quite a number of Dunn’s lots; also succeeded to all the tangible estate of Brown when it was thought advisable for him to leave the country. After he had succeeded in getting Dunn to convey her entire property to Brown, it was necessary to clear off the cloud of John H. Reddin on the title, and find a purchaser. Pendleton succeeded in doing both by bringing Reddin into the combine upon his own terms of compromise. To say he was not initiated fully would be to contradict not only his confederates, but all the facts and circumstances of the case. He was present at the general distribution; took what was left of the estate after the claims of Pendleton and Abbott, complacently christened “ commissions,” had been satisfied. His presence and participation in the matter at Yuma and Akron were incompatible with his claim of innocence. If the facts and circumstances stated were not conclusive in regard to his full knowledge of, and complicity in, the fraud, prior to and at the date of the attempted distribution, his immediate reconveyance of the property at the same time and place, and under the circumstances narrated by himself, is sufficient to convict him. His brother William G. Red-din, a conductor on the Burlington road, was not present; knew nothing about his purchase of the property on that day, or in regard to the property; had some $600 or $700 on deposit with the firm of which John G. was a member. He would see his brother that night; did not wait, but thinking it would suit him, conveyed it, and left the deed for record, with orders to have it sent to William G. On his return to Denver that evening, saw his brother, and, on the platform at the depot, sold it to him, taking the $600 in the firm, and subsequently the note of William G. for the balance, which had not been paid at the time of the trial. The pretended consideration was $2,800, made up as follows: Claim against the male Dunn, $1,000 (for which he had on *526 the same day offered to take $500) ; cash paid Brown, $1,250 ; his trip to Yuma and Akron, $50, — aggregate, $2,300. “ He only wanted to get out even.” To get even he makes the trade solus ; gets his brother to ratify his conveyance; takes $600 cash in place of $1,250 cash paid out, and the Dunn claim, $1,000; takes the note of his brother, payable six months after date, for $1,700, without security upon the land or otherwise, — a very peculiar business transaction for a man whose only anxiety was to get out the money he had put in on the same date. The whole case of William G. Reddin rests upon the testimony of his brother John H. William G. was not sworn. The court was justified in disregarding the entire testimony of John H.; it was utterly unworthy of credit. This disposes of the contention that John H. was an innocent purchaser without notice. It is unnecessary to invoke or apply any principle of law in a case like this. All that is necessary to dispel the illusion is the statement of the universal and undisputed rule in regard to notice. It is not even necessary that the grantee should have actual knowledge of the fraud. “ What would be constructive notice * * * may be said to be a knowledge by the purchaser of some facts which would put him upon inquiry, and require him to examine other matters that would generally unfold the true title.” 3 Wash. Real. Prop. 328.
In regard to the claim of William G. Reddin, it is only necessary to say that he was not a purchaser at the time of the conveyance. It was not a voluntary conveyance by John H. , in which he in no way participated. The transaction lacked other elements indispensable to render it valid,— there was no consideration, delivery, or acceptance of the deed. Subsequent ratification was attempted to be proved by John H., but the testimony was too weak to establish it. So far as appears from the record, William G. was only a passive convenience in the hands of his brother. It is not shown that he ever personally asserted any right or claim whatever. He wisely kept himself from any active participation. The only criticism of him that can be indulged in *527 is in Ms allowing the use of his name to assist in the consummation of one of the most deliberate frauds ever brought to the attention of a court. The decree of the court below, canceling all conveyances, and branding the entire transaction with the mark of its true character, was correct, and must be affirmed. Courts of equity do not lend themselves as agents to perpetrate fraud and robbery, or to assist parties in retaining the proceeds.

Affirmed.